IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Anna Lee Kemp,<br><br>                           Plaintiff,<br><br>vs.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>                           Defendant. | Civil Action No. 6:08-313-HMH-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits (DIB) on February 18, 2005, alleging that she became unable to work on December 23, 1998.[2] The

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2] The plaintiff previously applied for disability insurance benefits (DIB) on July 16, 2001, alleging she became disabled on December 24, 1998. That application was denied initially on November 1, 2001, and on reconsideration on April 23, 2002, constituting a final decision by the Commissioner. Thus, the plaintiff's disability determination for her current application commenced on April 24, 2002, the date following the plaintiff's most recent prior unfavorable decision. The plaintiff was last insured for benefits on December 31, 2003; therefore, the issue here is whether the plaintiff was disabled between April 24, 2002, and December 31, 2003.

application was denied initially and on reconsideration by the Social Security Administration. On February 3, 2006, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her attorney, her husband, and a vocational expert appeared on January 12, 2007, considered the case *de novo*, and on July 26, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 27, 2007. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant last met the insured status requirements of the Social Security Act on December 31, 2003.
>
> (2)     The claimant did not engage in substantial gainful activity during the period from April 24, 2002, through her date last insured of December 31, 2003 (20 CFR 404.1520(b) and 404.1571 *et seq*.).
>
> (3)     Through the date last insured, the claimant had the following severe impairments: migraine headaches and a history of closed head injury (20 CFR 404.1520(c)).
>
> (4)     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> (5)     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a significant range of sedentary work. Specifically, the claimant was able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally. The claimant could not climb or perform work requiring exposure to hazards or temperature extremes. Additionally, she was restricted from work at a production line or work performed at a production rate pace. Finally, the claimant was limited to low stress[2] work. Such a

residual functional capacity was well supported by the weight of the evidence of record.
[FN2 - "Low stress" was defined as requiring no more than occasional decision-making or changes in the work setting.]

(6)  As a result of her residual functional capacity as described above, through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

(7)  The claimant was born on August 28, 1959 and was 44 years old on her date last insured, which is defined as a younger individual age 18-44 (20 CFR 404.1563).

(8)  The claimant has at least a high school education and is able to communicate in English (20 CFr 404.1564).

(9)  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)  Through the [date] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

(11)  The claimant was not under a disability as defined in the Social Security Act, at any time from April 24, 2002 through December 31, 2003, the date last insured, or thereafter (20 CFR 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and

who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the

national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 43 years old at the time her disability determination commenced for her February 2005 application, and 46 years old the time of her date last insured, December 31, 2003. She has a high school education and worked in the vocationally relevant past as a travel consultant, sales agent, administrative assistant,

executive assistant, office assistant, and office manager. The plaintiff alleged that she became disabled due to cluster migraines headaches, pain, inability to concentrate, and memory loss, resulting from a severe head injury in December 1998, and thyroid problems, hypoglycemia, and allergic reaction to medications.

***Medical Evidence Between April 24, 2002, and December 31, 2003***

The plaintiff claims her problems stem from an incident in December 1998, when she slipped on some ice and hit her head. In January 1999, she presented to Richard W. Marcus, M.D., and Gary Poston, P.A., with complaints of headaches. In addition to the headaches, she complained of momentary loss of consciousness, nausea, vomiting, and intermittent dizziness. Examination showed that the plaintiff's attention span, concentration, language, and fund of knowledge were all intact, and that her motor, sensory, coordination, gait, and reflexes were within normal limits (Tr. 181-83).

On June 26, 2002, the plaintiff reported to Valerie Scott, M.D., that she had noticed a decrease in her migraine headaches and depression with Topamax (used for migraine headache), and that she was very pleased with the effects of the medication (Tr. 223).

Treatment notes from Dr. Scott dated February 25, 2003, indicated that the plaintiff was going to Weight Watchers and exercising on a treadmill (Tr. 217-18).

On April 28, 2003, Marshall A. White, M.D., the plaintiff's treating neurologist, noted that the plaintiff was doing better on Lexapro (antidepressant) and Topamax. The plaintiff reported that she was considering going back to work, and Dr. White stated that he would begin weaning her off of Lexapro. Further, Dr. White encouraged the plaintiff to work flexible hours with flexible productivity demands (Tr. 339).

Treatment notes from Stacey Condren, M.D., dated November 11, 2003, indicated that the plaintiff's nervous system was intact, and that she denied any syncope, seizure, paresthesia, muscle weakness, or coordination problems (Tr. 255-56).

Treatment notes from Dr. White dated November 24, 2003, indicated that the plaintiff reported occasional breakthrough headaches, and that she missed jury duty due to severe migraine headaches. Dr. White noted that he weaned the plaintiff off of her Lexapro, and that the plaintiff reported feeling better (Tr. 338).

***Medical Evidence After December 31, 2003***

Treatment notes from Thomas A. Privett, M.D., dated May 10, 2004, indicated that the plaintiff had "very good clinical response" to Topamax. Examination revealed that she stood without assistance, had normal station and gait, and had intact sensory and deep tendon reflexes (Tr. 335-36).

On August 16, 2004, Dr. Privett noted that the plaintiff's neurological examination was unchanged from her previous visit. The plaintiff reported that she was reluctant to take antidepressants because she felt they were a "component" of her headaches (Tr. 334).

On January 21, 2005, Dr. Privett noted that the plaintiff was moderately labile at times, but maintained good eye contact. Sensory and deep tendon reflexes were intact without any lateralization. Dr. Privett further noted that a recent MRI of the plaintiff's brain performed in April 2002, and an electroencephalogram were normal. Dr. Privett recommended a return visit in two weeks (Tr. 332).

Treatment notes from Dr. Privett dated February 21, 2005, indicated that an MRI of the plaintiff's cervical spine performed on February 11, 2005, revealed moderate diffuse disc bulge at the left C6-7, broad disc protrusion at C5-6, with mild bilateral neural

foraminal compromise, small left C6-7, and C6 nerve root difficulty. Dr. Privett's impressions were multiple diffuse symptoms that included headaches, paresthesia, syncope versus seizure disorder, and possible narcolepsy (Tr. 328-29).

On June 29, 2005, Brian L. West, Ph.D., performed a neuropsychological evaluation for cognitive dysfunction. The plaintiff reported cognitive changes, including short-term memory dysfunction, headaches, spatial orientation problems, and disorganization and a decline in attention regulation. Dr. West opined that there was significant neurocognitive dysfunction particularly for visuospatial learning and memory functions but not for interpretation of visuospatial stimuli. Also, Dr. West opined that overall the plaintiff's cognitive functions were suggestive of significant attention regulatory problems along with slow processing speeds not uncommon in individuals with frontal lobe involvement (Tr. 290-94).

On September 30, 2005, Dr. Privett noted that the plaintiff continued to complain of migraine headaches, insomnia, and remote closed head injury with post-concussion syndrome.[3] She complained of getting lost when she tried to go to Costco and instead went to Sam's Club. Dr. Privett questioned whether he should prescribe Namenda, a medication used for cognitive enhancement (Tr. 325-27).

On November 21, 2005, the plaintiff reported to Dr. Privett that she was doing better with her headaches, insomnia, and post-concussion syndrome, since seeing a headache specialist in Texas (Tr. 323).

Treatment notes dated November 7, 2006, from Dr. Privett indicated that the plaintiff reported doing much better on the magnesium supplement prescribed by her headache specialist in Texas. Dr. Privett noted that the plaintiff appeared much happier

---

[3]Post-concussion syndrome include symptoms such as headaches, dizziness, fatigue, irritability, anxiety, insomnia, loss of concentration and memory, and noise and light sensitivity. *See* MayoClinic.com *available at* http://mayoclinic/health/post-concussion-syndrome.

8

and stated that her headaches had decreased significantly. The plaintiff actually had no new complaints (Tr. 320).

***Statements and Testimony***

At the January 12, 2007, administrative hearing, the plaintiff testified that it was difficult to retain things once she read them (Tr. 353), and that she had no short-term memory (Tr. 353-54). She testified that her headaches started after her accident in December 1998 (Tr. 355). The plaintiff claimed she sought treatment for her headaches, but that the treatments were not completely effective (Tr. 356).

The plaintiff also stated that in 2003 she suffered from depression, but that it got better (Tr. 357). She admitted that during 2003 she never sought mental health counseling from a psychiatrist, or mental health professional (Tr. 358). In addition, she claimed that she tried several types of antidepressants, but that they caused multiple side effects (Tr. 358).

The plaintiff also testified that after her accident in December 1998 she experienced left eye pain and visual changes (Tr. 359). She claimed problems with confusion after the accident (Tr. 359). She testified that her confusion did not really get better until 2006 (Tr. 360). The plaintiff later testified that her confusion and memory problems did not get better until three years after the accident (Tr. 362-63).

With regard to daily activities, the plaintiff testified that she could do the dishes, clean her house, and do some laundry, though not every day (Tr. 361).

Robert Allen Kemp, the plaintiff's husband, also testified at the January 2007 hearing (Tr. 365-71). Mr. Kemp stated that the plaintiff had four or five good days out of a month, that she had problems with her memory, and that she had problems with attention and understanding, but that these problems got better (Tr. 368). Mr. Kemp testified that

Maxalt was helpful in reducing the plaintiff's migraine headache, but did not prevent them (Tr. 368). Mr. Kemp also testified that magnesium and steroid infusions provided the plaintiff with relief from her headache for about 30 to 45 days (Tr. 370). Mr. Kemp testified that since October 2005, the plaintiff had received five infusions (Tr. 370). He stated that if the plaintiff had a job, it would have to be one that did not require her to show up on a regular basis, due to her migraine headaches (Tr. 369).

*Vocational Expert Testimony*

Luther Pearsall, Ph.D., a vocational expert, also testified at the January 12, 2007, administrative hearing (Tr. 371-375). Dr. Pearsall testified that all of the plaintiff's past work was at the skilled level (Tr. 372). The ALJ asked Dr. Pearsall to assume the following:

> ... a hypothetical worker the same age as [Plaintiff], the same work history and education, who retains a light to sedentary exertional capacity only, with the following limitations applicable to both levels of exertion. No climbing, no exposure to industrial hazards, no exposure to temperature extremes, no work on a production line, or at a production rate pace, and finally work in a low stress setting where there is no more than occasional decision making or changes in the work setting (Tr. 372).

In response, Dr. Pearsall testified that the plaintiff could perform the sedentary, unskilled jobs of weigher or weight tester (*Dictionary of Occupational Titles* (DOT) code 539.485-010) (approximately 1,000 jobs existing in South Carolina and in excess of 38,000 jobs existing in the national economy) and telephone quotation clerk (DOT code 237.367-046) (approximately 1,800 jobs existing in South Carolina and in excess of 70,000 jobs existing in the national economy) (Tr. 372). Dr. Pearsall also testified that the plaintiff could perform the light, unskilled jobs of parking lot attendant or cashier at a parking lot facility (DOT code 329.467-010) (approximately 1,500 jobs existing in South Carolina and in excess of 55,000 job existing in the national economy) and the job of cashier (DOT code 211.462-010)

(approximately 17,000 jobs existing in South Carolina and in excess of 330,000 jobs existing in the national economy) (Tr. 373).

## **ANALYSIS**

The plaintiff has a high school education and past relevant work experience as a travel consultant, sales agent, administrative assistant, executive assistant, office assistant, and office manager (Tr. 125). She alleges that she became disabled due to cluster migraine headaches, inability to concentrate, memory loss resulting from a head injury in December 1998, thyroid problems, hypoglycemia, and allergic reaction to medications (Tr. 112). The plaintiff was 43 years old at the time her disability determination commenced for her February 2005 application, and 46 years old on the date she was last insured, December 31, 2003 (Tr. 13-14). The ALJ determined that the plaintiff retained the residual functional capacity ("RFC") to perform "sedentary work with no climbing, exposure to hazards or temperature extremes, production line work or work at a production rate pace or work requiring more than occasional decision-making or changes in the work setting (low stress work)" (Tr. 18, 23). The plaintiff argues that the ALJ erred by (1) failing to properly consider the combined effect of her multiple impairments; (2) failing to properly consider her credibility; (3) wrongfully rejecting expert medical opinion evidence; and (4) failing to pose a proper hypothetical to the vocational expert. The issue before the court is whether the plaintiff was disabled between April 24, 2002, and December 31, 2003.

### *Combined Impairments*

The plaintiff first argues that the ALJ failed to consider all of her impairments in combination. The ALJ found that the plaintiff had the following severe impairments: migraine headaches and a history of closed head injury (Tr. 16). He also found that the plaintiff suffered from the following non-severe impairments: depression, vision problems,

11

seizure disorder, and hypothyroidism (Tr. 16, 17). In a disability case, the combined effect of all a claimant's impairments must be considered without regard to whether any such impairment, if considered separately, would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

The defendant argues that because the ALJ stated that he considered the plaintiff's impairments in combination, the analysis was sufficient (def. brief 12; *see* Tr. 17). The plaintiff contends that the ALJ failed to analyze the cumulative effect of her impairments and provide sufficient rationale for his conclusion that she did not suffer from a combination of impairments that rendered her disabled. The plaintiff notes that at the hearing the ALJ fragmented her impairments when he questioned her about her inability to work. The ALJ told the plaintiff to "forget for a moment . . . about the migraine difficulty" and "focus on the mental aspects" in answering whether she would be able to perform unskilled work (Tr. 363). This court agrees with the plaintiff that the ALJ failed to provide sufficient rationale for his conclusion. Upon remand, the ALJ should be instructed to consider the plaintiff's combined impairments in accordance with the above law and to provide rationale for his conclusions.

*Credibility*

The plaintiff next argues that the ALJ failed to properly assess her credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)   the individual's daily activities;

(2)   the location, duration, frequency, and intensity of the individual's pain or other symptoms;

13

>  (3)   factors that precipitate and aggravate the symptoms;
>
>  (4)   the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
>  (5)   treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
>  (6)   any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
>  (7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (Tr. 21). The plaintiff contends that the ALJ erred by insufficiently answering the threshold question regarding her credibility, wrongfully requiring objective verification of her symptoms, and relying upon isolated references taken out of context in finding her testimony less than credible. This court agrees.

As noted by the plaintiff, the ALJ specifically stated that he relied in part upon "the lack of objective verification of the claimant's complaints . . . in determining the claimant's allegations regarding her functional limitations and pain are not fully credible . . ." (Tr. 21). Where a claimant has met the burden of showing an impairment that could reasonably cause the symptoms alleged, then the claimant is thereafter entitled to rely exclusively on subjective evidence to prove the intensity, persistence, and severity of the related symptoms. *Hines v. Barnhart*, 453 F.3d 559, 564-65 (4th Cir. 2006).

14

Further, the ALJ relied upon isolated references taken out of context in finding the plaintiff's testimony less than credible. The ALJ found that the record failed to indicate that the plaintiff suffered from speech problems following her accident in 1998 (Tr. 20); however, records from HealthSouth indicate that the plaintiff was undergoing speech therapy for a cognitive speech disturbance caused by her closed head injury in December 1998 (Tr. 312-15). The ALJ found that treatment notes indicating temporary improvement in the plaintiff's headaches were contrary to her testimony (Tr. 20); however, both the plaintiff and her husband testified that she had experienced intermittent, temporary short-term relief of her migraines with different treatment regimens, but that the migraines always returned to their previous excruciating status (Tr. 356, 367). The ALJ found that despite the plaintiff's history of head injury and headaches, there is no evidence that she ever suffered from eye pain (Tr. 20); however, records from Graystone Ophthalmology and Pearl Vision reveal that the plaintiff did complain of blurry vision, eye pain, and temporary loss of vision (Tr. 169, 277-88). The ALJ found that treatment notes fail to document any alleged complaints regarding weather-related complications (Tr. 20); however, records from The Endocrine Center PA and Charleston Neurology Associates reveal that the severity of the plaintiff's migraines was affected by the hurricane season and changes in barometric pressure (Tr. 252, 331, 334). The ALJ found that the treatment notes failed to indicate the plaintiff could not drive (Tr. 20); however, records from Charleston Neurology Associates reveal that the plaintiff was advised not to drive due to seizure disorder caused by her closed head injury in December of 1998 (Tr. 324, 332). The ALJ found that the treatment notes failed to document that the plaintiff complained of vertigo (dizziness) (Tr. 20); however, records from Neurology Associates, James Island Medical Center, The Endocrine Center PA, and Charleston Neurology Associates reveal that the plaintiff repeatedly complained of dizziness (Tr. 179, 181, 227, 251, 324). The ALJ found there was no objective evidence to support that the plaintiff has a venous angioma on the left frontal lobe

of her brain (Tr. 20); however, records from Charleston Neurology Associates reveal that an MRI of the plaintiff's brain showed a venous angioma to her left frontal lobe (Tr. 326). The ALJ found that treatment notes did not support he plaintiff's complaints of memory loss, confusion, episodes of loss of awareness, or inability to concentrate (Tr. 20); however, treatment notes from Neurology Associates, James Island Medical Care, Charleston Neurology Associates, HealthSouth, and Charleston Psychiatry reveal that the plaintiff complained of memory loss, confusion, loss of awareness, and difficulty concentrating (Tr. 173, 224, 231, 232, 290, 291, 292, 293, 295, 325, 331).

The plaintiff also contends that the ALJ attempted to further undermine her credibility by relying on isolated snippets of evidence that support his ultimate conclusion without mentioning or reconciling the evidence that directly contradicts his position. This court agrees. For example:

- The ALJ found that the plaintiff reported in September of 2001 that she "only sometimes" had difficulties preparing meals and that she liked to walk on the beach, meditate, do yoga, and visit with friends (Tr. 21); however, the very exhibit upon which the ALJ relies also shows that she spent between zero and three to four hours per week participating in these activities, and that she visited with friends once every few months to twice a year (Tr. 165). This same exhibit upon which the ALJ relies also shows that the plaintiff's headaches were "unbearable," that she was suffering from memory problems, confusion, and that even the "simple things in life were often too much" (Tr. 166). The ALJ did not mention this additional evidence or reconcile it with the evidence he used to discredit the plaintiff.

- The ALJ found that the plaintiff reported that she had "spent the day running errands including shopping" (Tr. 21), but the ALJ made no mention of the fact that this very same exhibit upon which he relied to discredit the plaintiff also reveals that while she was out running these errands she got lost, experienced right arm jerking and nausea, became very upset and was crying, lost consciousness, temporarily lost the ability to move her right arm and leg, slept until the following afternoon, and woke up with a headache (Tr. 224).

- The ALJ found that the plaintiff was considering another work attempt in April of 2003 (Tr. 21), but he failed to mention that this same exhibit reveals that the plaintiff's neurologist advised her to look for work with flexible hours (Tr. 339).

- The ALJ found that the plaintiff was exercising in February 2003 (Tr. 21), but the ALJ failed to mention that this very same exhibit revealed that the plaintiff was "working

on" trying to exercise, but that she had felt extremely tired, had a low grade temperature, and was having urinary difficulties, and that these symptoms had been ongoing for six weeks (Tr. 217).

Upon remand, the ALJ should be instructed to analyze the plaintiff's subjective complaints under the two-step process and in accordance with the above-cited law.

The plaintiff next argues that the ALJ wrongfully rejected her husband's testimony on the basis that he was not an "acceptable medical source" (Tr. 22). Mr. Kemp testified that the plaintiff had not been fully functioning since she suffered the closed head injury in 1998 (Tr. 367). He stated that while she did have some good days, she would then have "days on end" where she was in bed with pain and would not get up even to shower. Mr. Kemp testified that the plaintiff's migraines were almost continuous between 1998 and 2003. He said that the plaintiff experienced temporary relief at times, with new medications, but that the headaches would always eventually return (Tr. 367). Mr. Kemp said that some drugs made her headaches worse. He testified that the plaintiff had about four to five "good days" per month. Mr. Kemp also confirmed that the plaintiff suffered from short- and long-term memory loss and severe attention deficit (Tr. 368). Mr. Kemp believed that the frequency of her migraines would prevent her from working (Tr. 369). He opined that the plaintiff would need a very understanding employer to hold down a job, one who would allow her to lie down or go home every time she got a migraine. Mr. Kemp also expressed concern about the plaintiff driving during a migraine and concluded that this further prevented her from being able to maintain regular employment (Tr. 370).

The ALJ found that Mr. Kemp's opinion was inconsistent with other evidence and that he was "understandably motivated to help the claimant in her attempt to gain disability benefits by providing as strong a recommendation as possible." Accordingly, the ALJ gave Mr. Kemp's testimony minimal weight (Tr. 22).

17

Social Security Ruling ("SSR") 85-16 discusses the importance of lay witness testimony in cases where the claimant suffers from a mental impairment. It states that the testimony of family members often plays a vital role in determining the effects of a plaintiff's mental impairments. SSR 85-16, 1985 WL 56855, *4.

As argued by the plaintiff, the ALJ did not even outline Mr. Kemp's testimony, but simply stated that he opined his wife was disabled but that Mr. Kemp's non-acceptable medical source status rendered his opinion unworthy and his opinion was inconsistent with objective evidence and tainted by motivation to get benefits for the plaintiff. Upon remand, the ALJ should be instructed to consider Mr. Kemp's testimony and provide rationale for his conclusion as to his credibility so that this court may determine whether substantial evidence supports the ALJ's finding.

### *Expert Medical Opinion Evidence*

The plaintiff argues that the ALJ wrongfully rejected the opinion of Dr. Cary Weber, a clinical psychologist who performed a psychological evaluation of the plaintiff on September 25, 2001 (Tr. 196-201). After administering a complete psychological exam, including various tests, Dr. Weber concluded that the plaintiff suffered from a cognitive disorder (Tr. 200). She reported that the plaintiff had great difficulty with sustaining attention, concentration, and with her ability to retain and use sequences of visual stimulus (Tr. 201). Dr. Weber opined that the plaintiff's poor concentration might be a result of her head injury and that she was depressed secondary to this and memory loss.

The ALJ gave Dr. Weber's psychological expert opinion "minimal weight" on the basis that it was unsupported by the weight of evidence of record and the plaintiff's daily activities as the ALJ described them (Tr. 21). As previously discussed above, the ALJ

failed to consider all of the relevant evidence of record. Accordingly, upon remand, the ALJ should be instructed to consider Dr. Weber's opinion in light of all the evidence of record.[4]

***Vocational Expert***

Lastly, the plaintiff contends that the ALJ failed to pose a proper hypothetical to the vocational expert ("VE") because he did not include her memory, concentration, and attention impairments and her need for a job with flexible hours to accommodate her unpredictable migraines (Tr. 372). In response to the plaintiff's counsel's additional restrictions, the VE testified that there would be no jobs available for an individual whose attention, concentration, and memory was impaired for 20% of the time (Tr. 374). The VE also testified that jobs at unskilled levels have a very high expectation of regular attendance, eight hours a day, and 40 hours a week (Tr. 374). He explained that an individual incapable of working at this capacity, for any reason, would be precluded from finding employment at any exertional level (Tr. 374).

"[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). As discussed above, upon remand, the ALJ should be instructed to consider all of the relevant evidence of record. Further, the ALJ should be instructed to include all of the plaintiff's impairments in the hypothetical to a vocational expert.

---

[4] The court recognizes that the fact Dr. Weber's report was issued in September 2001 and was offered after examining the plaintiff on only one occasion are valid considerations by the ALJ in determining the weight to give Dr. Weber's opinion (*see* Tr. 21).

19

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

                                                    s/William M. Catoe
                                                   United States Magistrate Judge

January 26, 2009

Greenville, South Carolina